Our final case this morning is Eden Rae Adhami, 2024-12-18. Mr. Hyde. Good morning, your honors, and if it pleases the court, my name is Marty Hyde and I represent the patent applicant, in this case, Dr. Eftin Adhami, and I'm trying not to take it personally that I cleared out the courtroom. This case is about the patent bargain. And that patent bargain says that any person skilled in the art should be able to make, use, and operate an invention that's in a patent. There's no dispute that that person skilled in the art, in this case, are medical doctors, or persons have... Counsel, please listen to questions rather than keep your eyes focused on your brief. The law requires enablement in a patent application. It does. And it requires enablement consistent with the scope of a claim. And here we have a claim which encompasses a variety of alcohols, some of them toxic, one of them, ethylene glycol, is essentially antifreeze, and basically your specific disclosure is one anecdotal instance of a person brought into an emergency room and treated, and then two years later, he's found to be free of HIV, that's not an enabling disclosure of a claim of this breadth? So, thank you, Judge Lurie. Let me try to unpack your question. First of all, as far as toxicity goes, toxicity should not be a determination factor whether it's enabled or not. There are many materials that are used in medicinal cases that are highly toxic. For example, Toxol is a medicine that's patented and has been on the market for over 20 years, that's highly toxic, but it's also used to treat breast cancer and other types of cancers. But there isn't a disclosure in the application of dosages for the various alcohols. Well, so again, the person having ordinary skill in the art is critical here. This is a patent written by a doctor for other doctors, for other medical professionals, and yes, the anecdotal example that you mentioned is just anecdotal, and it was placed in the specification merely as background, not as a working example of the application. He might have been better off without it. Yes, exactly, Your Honor. And limiting your claim to ethanol. Well, we could limit the claims to ethanol, but Dr. Adami, in his professional opinion, felt that some of the other alcohols that are in that same series would also be useful in treating HIV virus. Well, there's a big difference between ethanol and ethylene glycol and methanol. Actually, not really, Your Honor. Ethylene glycol has... You didn't drink methanol tonight. Well, methanol is toxic, so is taxol. Ethanol is toxic in high doses, and ethylene oxide is toxic in high doses. But all those materials are alcohols. But the board's conclusions, I thought, were driven by the fact that there's no guidance as to what the amount of which alcohol and for what duration to use. There's none of that information. Well... Are they wrong about that? Are we missing something? Well, I think that's where the person have... This is a... The person having an ordinary skill in the art here is extremely advanced. That person... So, in order to go your way, we have to accept your assertion that a person skilled in the art would have known what amount of which alcohol and for what duration to use it. So, Your Honor, you don't have to accept what I say. You just have to look at the claims. And the patent office, actually, their best argument is one raised by the examiner. And he said, well, I believe it was a he, that the claim doesn't say when to stop, right? When to stop the treatment. Well, I'm not the sharpest tack in the box, but if I had HIV, I'd want that viral load to be zero. And I'm sure a person having ordinary skill in the art, a medical doctor, would know when to stop the treatment at an acceptable HIV load. And the HIV load is easily measured. In fact, the PTAB's reference, SONAT, uses PCR to determine viral loading. So, even the patent office has agreed that it's easy... Not easy, but it's part of the art to be able to understand what the viral load is. So, your position is that someone skilled in the art would just know, and they don't need working examples, and they will just continue to try it. And if the person survives, then the person survives. So, I apologize. I'm hard of hearing, so if you could speak up. Of course. It seems to me that your position is, well, a person skilled in the art would know when to stop with the doses, would know, despite the fact that there are no working examples. Even if knowing when to stop might be when the patient expires. That sounds kind of crazy to me. So, that brings up two points. A patent does not have to guarantee results. Paxil is patented, but people still die from breast cancer. The other thing, the premises that a person having... They die from breast cancer because they weren't cured, or because they took too much Paxil? Because they were not cured. Okay, but that's a distinction. Yeah, well, in this case, a patent does not have to guarantee results. It just sets out, as Judge Lurie mentioned, that it has to be enabled. A person that it's designed for has to be able to carry out the invention. And the patent office didn't point out a single step, a single step, that a person having ordinary skill in the art could not carry out. Their determination was conclusory. They looked at the whole invention and said, this doesn't work. And they cited five examples. They cited five studies. Counsel, it's a bit off the track with respect to enablement, but I can't imagine this claim. Patent gives, as you know, a right to exclude. I can't imagine who is going to be excluded here. Is someone going to treat HIV by putting someone under anesthesia and then intubation? Well, the alternative is to die from HIV. So if I... There are lots of treatments for HIV. I see them on television every night. I understand. But again, that's outside the scope of the claims. So we're not trying to, we're trying to treat HIV with these claims. And all these claims, and the patent office doesn't argue that any of these steps in the patent are unable to be carried out by the person having ordinary skill in the art, the faceta. So... I guess entry into an emergency room isn't in the claim. I'm sorry, Your Honor. Entry into an emergency room and treatment and waiting for two years isn't in the claim. So it doesn't exactly track these, isn't your example? Well, that's correct. The anecdotal example was... We would have been better off without that in there because you don't have to have a working example to get a patent. It's constructive reduction to practice. That anecdotal example was put in there primarily just to show Dr. Adami's thought process in coming up with this invention. Now, the patent office makes a lot of, spends a lot of time talking about that anecdotal example. So I would say, imagine that anecdotal example isn't in the patent. If it's not in the patent, it's not an issue. And a patent that reduces an invention to constructive use is patentable. So let me try to get back on track here with my arguments. I think the examples in Amgen versus Sanofi are really helpful to understand what the scope is of the enablement requirement. And in that case, went up to the Supreme Court. Judge Lurie's opinion was unanimously accepted by the Supreme Court. And the examples that are in Samgen in the Supreme Court case are, I think, instructive. You look at the Samuel Morse patent that's discussed in the Amgen case. And there you've got seven claims that everyone agreed was allowable. The eighth claim, Samuel Morse tried to claim all means of achieving telegraphic communication. Very, very broad. And didn't provide the details of how to enable that claim in the specification. Unlike Dr. Adami, his claims are self-enabling. A person having ordinary skill in the art, a medical doctor or a Ph.D., could read these steps and be able to practice the invention. Counsel, you are into your rebuttal. You can continue or save it as you wish. I'm sorry, Your Honor. Can you repeat that? You are into your rebuttal time. You can continue to use it or save it. I'd like to reserve for rebuttal, Your Honor. Fine. Thank you. Excuse me, Your Honor. I'm sorry. Ms. Kelly, good morning. Good morning, Your Honors. May it please the Court. The Board correctly found that persons of ordinary skill in the art, as Judge Prost recognized, would not know how much of at least three of the recited alcohols to give to a patient and for how long in order to reduce viral load. The Board further found, and correctly so, as Judge Lori recognized, that at least three of these alcohols are toxic to humans. And the fact that there is so much unpredictability in the art, that it was very likely that this, given this unpredictability, that this method would not reduce viral load at best, and at worst that it would kill a patient. Of course, dosages are usually a matter for the FDA. And it is standard with method of treatment claims to use, to file before one has clinical data based on animal studies and have a range of dosage. If he had done that, if they had done that, one wouldn't necessarily need an actual example. Correct, Your Honor, because in that case, the art would have been less unpredictable. If there were in vitro studies and in vivo studies in animals, this wouldn't be an unpredictable area. But as it were, the problem here is that we're dealing with something that is known to kill people. You know, people try to commit suicide, as the Krupkowski reference shows. People have tried to commit suicide using all four of the recited alcohols. And that's how toxic those, at least three of them, can be. And we're talking about very high levels. So we're talking about a .4 blood alcohol level for ethanol. And there really isn't any guidance as to what is needed, given the unpredictability in the art, for the methanol, the ethylene glycol, and the isopropanol. So the Board correctly found that there really isn't any likelihood that this invention will reduce HIV burden. And there is a likelihood that it might kill somebody. And as this Court recognized in cases like 318 patent litigation and I want to make sure I get this name right, Press Control Group v. Hydric Claim, that the utility and the enablement requirement are very closely related. And if the claim fails to be useful or operative, in this case, then it also fails to meet the how-to-use component of the enablement requirement. And so for at least those two reasons that the Board found, these claims are not enabled. Do your honors have any further questions? Apparently not, Ms. Kelly. Thank you. We'll cede our time. Mr. Haar, you have up to four minutes if you need it. Let me just summarize and bring up some points that were raised in the PTO's arguments. First of all, this idea of predictability. Again, a patent does not have to guarantee results. That's well established. The toxicity of the materials I don't think is an issue. There's a plethora of examples of toxic materials being used as medicine under the guidance of a person having ordinary skill in the art. A medical doctor or Ph.D. or someone that has that knowledge to be able to apply the highly toxic materials. As far as the patent office making that determination, I think they're out of their jurisdiction. That's not what the patent statute requires. The patent statute requires that an inventor provide details of how to use the invention. Whether it should be acceptable or not is not part of the US PTO's mandate. That's the FDA or other medical associations or regulatory bodies to determine whether a treatment is practical or not or effective or should be used. That is not the patent office's bailiwick. Does the specification disclose specific doses for ethanol and different doses for ethylene glycol and different doses for methanol? I can't cite to the specification directly, but the specification does talk about the relative toxicity of those materials and how to treat it, how to use those in the claims. But again, the claims are self-enabling. You cannot look at these claims as a medical professional and say, I don't know how to do that stuff. In fact, I don't think you even have to reach the Enron wand factors in this case because Enray Wands is all about undue experimentation. There's no undue experimentation needed here. And that's even given the fact that experimentation is allowed, reasonable experimentation is allowed by the person having ordinary skill in the art. The patent office never brought up any specific step in this claim. They used references that were inopposite. They used four references that talked about alcohol use over a long period of time. They were all longitudinal studies. The fifth reference said, you know, ethylene glycol could be toxic. Well, water is toxic in high concentrations. So it's up to the person having ordinary skill in the art to implement this invention, and Dr. Adami believes that he did so. So, Your Honors, we just ask that this Court reverse the PTAB's ruling and remand for further processing as the Court shall determine. So, thank you. Thank you, counsel. Thank you to both counsel. The case is submitted. And that concludes today's arguments.